UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
JOHN PAULOSE,                           :
                                        :
                      Plaintiff,        :      05 Civ. 9353 (DLC)
                                        :
            -v-                         :      OPINION AND ORDER
                                        :
NEW YORK CITY DEPARTMENT OF EDUCATION.  :
                                        :
                      Defendant.        :
                                        :
----------------------------------------X

Appearances:

For Plaintiff:
Rahul Manchanda
Manchanda Law Offices PLLC
80 Wall Street, Suite 705
New York, NY 10005

For Defendant:
Michael A. Cardozo
Jennaydra D. Clunis
Corporation Counsel of the City of New York
100 Church Street, Room 2-188
New York, NY 10007-2601

DENISE COTE, District Judge:

        Plaintiff John Paulose ("Paulose"), a self-described "Asian
of East Indian national origin," brings this Title VII
employment discrimination action against his employer, the New
York City Department of Education ("DOE").  A middle school math
teacher, Paulose claims that he was given unsatisfactory
performance ratings, sent racist articles, demoted to doing non-
teaching work, forced to resign, and blacklisted from teaching

for the DOE on the basis of his race and national origin.[1]  He
also contends that he experienced retaliation for reporting
incidents of sexual misconduct and discrimination.  Finally,
while Paulose did not separately allege in his complaint that he
was subjected to a hostile work environment on the basis of race
or national origin, he now presses such a claim as related to
the allegations in the complaint and it is properly considered
on the instant motion.[2]  The plaintiff brings these claims under
Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2
to 2000e-3 ("Title VII"); the New York State Human Rights Law,

_____

[1] Although plaintiff's complaint does not allege discrimination
based on national origin, the parties' submissions on this
motion consider plaintiff to have made this allegation.

[2]  The defendant argues that Paulose is prohibited from bringing
a hostile work environment claim because he did not bring such a
claim in his complaint before the New York State Division of
Human Rights ("NYSDHR") or the complaint in the instant action.
Claims that were not asserted before an administrative agency
"may be pursued in a subsequent federal court action if they are
reasonably related to those that were filed with the agency."
Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 177 (2d Cir.
2005) (citation omitted).  "Reasonably related conduct is that
which would fall within the scope of the [administrative]
investigation which can reasonably be expected to grow out of
the charge that was made."  Id. (citation omitted).  Paulose's
complaint before the NYSDHR asserted that he suffered from
"harassment," that he was a "constant target for racial threats
from other teachers/co-workers," and that one teacher in
particular subjected him to "constant verbal threats."  A
hostile work environment claim is reasonably related to such
allegations.  While Paulose did not separately plead a hostile
work environment claim in his complaint, its allegations
generally put the defendant on notice of the claim and the
defendant has not shown that it has been prejudiced by the
plaintiff's failure to plead it more formally.

N.Y. Exec. Law § 296 ("State HRL"), and the New York City Human

Rights Law, N.Y.C. Code § 8-107 ("City HRL").[3]  For the following

reasons, DOE's motion for summary judgment is granted.


BACKGROUND

The following facts, drawn from the record the parties have

presented on summary judgment, are undisputed or taken in the

light most favorable to the plaintiff, unless otherwise

indicated.[4]  Paulose is a United States citizen born in Teekoy,

---

[3] The plaintiff's complaint states at one point that N.Y.C. Code
§ 8-101 ("Section 101") is the relevant provision of the code,
and later that N.Y.C. Code § 8-107 ("Section 107") is the
applicable provision.  Section 101 sets forth a policy against
"prejudice, intolerance, bigotry, and discrimination, bias-
related violence or harassment and disorder" and establishes the
New York City Commission on Human Rights.  Section 107 prohibits
employers and their agents from engaging in "[u]nlawful
discriminatory practices," such as "to refuse to hire, or employ
or to bar or to discharge from employment such person or to
discriminate against such person in compensation or in terms,
conditions or privileges of employment."  N.Y.C. Code § 8-
107(a).  Section 107 is the relevant section of the code.

[4] The defendant argues that the plaintiff's Local Civil Rule 56.1
Statement of Undisputed Facts ("56.1 Statement") is improper and
should be rejected because it does not provide numbered
paragraphs that admit or deny the facts set forth in the
corresponding paragraphs of the movant's 56.1 Statement.  In the
alternative, the defendant urges the Court to accept its reply
to the plaintiff's 56.1 Statement.  Following briefing on the
instant motion, the plaintiff requested the opportunity to
submit an Amended 56.1 Statement to correct any deficiencies.
While the plaintiff's 56.1 Statement does not specifically state
"admit" or "deny" in each numbered paragraph, it sets forth the
plaintiff's understanding of the facts of this case in numbered
paragraphs that correspond to those in the defendant's 56.1
Statement.  Although it is cumbersome, the plaintiff's

India.  Prior to joining the teaching staff of Community Intermediate School 339 ("CIS 339"), a middle school in the Bronx and in District Nine and Region One of the DOE, he earned both a bachelor of science degree in economics with a minor in mathematics and a master's degree in economics from the State University of New York Albany.  Paulose subsequently worked in the financial services industry.

In July 2003, the plaintiff applied for the master's program in education at Mercy College.  That same month, Charles Randina ("Randina"), the principal of CIS 339, nominated Paulose for a probationary position as a math teacher in the school. Paulose worked with a math teacher at CIS 339 on a voluntary basis over the summer to learn how to teach.  Soon thereafter, Paulose secured a two-year "conditional" license from the DOE to teach math in New York City junior high schools, effective starting on September 2.  The plaintiff assumed the position of a probationary math teacher for the sixth grade in September 2003.

submission fulfills the function of a 56.1 Statement and is deemed admitted, as is the defendant's Reply 56.1 Statement. Plaintiff's request to submit an Amended 56.1 Statement is therefore denied as moot.

A. 2003 Evaluations of Plaintiff's Teaching

     In October 2003, Randina conducted the first evaluation of
the plaintiff's teaching by observing him during a lesson.[5]  In
his written report of the observation, he rated the plaintiff's
performance unsatisfactory.  While Paulose did not formally
contest this rating, he indicated to Randina that it was unfair
to observe him without giving him prior notice and reported this
concern to his union representative.  Paulose testified that
Randina responded, "I'm the one in charge, I'm allowed to do as
being pleased [sic] to do surprised inspection."[6]  Two months
later, in December 2003, assistant principal James Williamson
("Williamson"), Paulose's immediate supervisor, gave the
plaintiff a satisfactory review after observing his class.


B. Purported Misconduct at CIS 339

     In January 2004, Paulose became aware of alleged acts of
misconduct at CIS 339, including sexual misconduct and racial

----

[5] The parties dispute the date on which Randina conducted his
first observation of plaintiff's teaching, but agree that it
took place in October 2003.

[6] In the plaintiff's deposition, defense counsel inquired whether
Paulose complained to Randina and his union representative about
the lack of a pre-observation report in October 2005.  The
plaintiff responded in the affirmative to these questions and
did not correct the date.  In light of the fact that the
observation at issue took place in October 2003 and that Paulose
left CIS 339 in April 2004, it appears that both plaintiff and
defense counsel mischaracterized the date of this report.

discrimination, through conversations with two students, Williamson, and another teacher at the school.  In mid-January, two female students asked Paulose if it was "normal for a teacher to have sex with students," and whether he would "do something like that."  Paulose was shocked by their questions. He responded that such acts were "sick" and "disturbing" and indicated that these actions should be "severely punished."

The plaintiff expressed his concerns to several teachers and in January 2004 to Williamson.  Williamson told Paulose that at CIS 339 "there were teachers who would verbally threaten other students, threaten administration" and that one teacher "allowed a student to be molested" by a fellow student. Williamson also stated that this particular student's abuse of another student was allegedly "covered up" by Randina, who removed the victim from the school, but did not take any disciplinary action against the offending student.[7]  In his January 2004 conversation with Williamson, Paulose also learned that Principal Randina systematically targeted African-American teachers for removal from the school.

---

[7] While the defendant denies that Williamson made these statements, it has not provided any evidence to controvert these facts, which are drawn from plaintiff's deposition testimony.

C. 2004 Unsatisfactory Evaluations

On January 29, Randina made a third observation of Paulose's teaching and subsequently issued a second written report deeming his lesson unsatisfactory.[8]  The next day, on January 30, Daisy Altreche ("Altreche"), the assistant principal of CIS 339, conducted a final observation of Paulose's teaching that resulted in a third unsatisfactory rating.[9]

That same day, the plaintiff was taken out of his classroom and called into Randina's office in the presence of Altreche and his union chapter leader, Robert Levine ("Levine").  Levine told Paulose that it was in his best interest to resign.  At the request of Randina, Altreche and Levine, the plaintiff signed a resignation letter, which was backdated to January 22.  The letter indicated that Paulose was resigning due to "unforeseen family problems" and that his resignation would be effective as of January 30.  Later that day, Paulose visited the office of his union in the Bronx where Mr. Katz, a United Federation of Teachers representative, told him to return to work the following school day.  The plaintiff rescinded his resignation

_____

[8] While this written observation is dated January 28, 2004, both the plaintiff and defendant agree that Randina observed Paulose on January 29.

[9] Plaintiff's deposition and affidavit are contradictory as to whether the events described as taking place on January 30 transpired on that date, February 1, or February 2.

in writing, indicating that the resignation letter had been presented to him "[u]nder duress," and without proper counsel or due process.[10]

On February 2,[11] Randina issued a letter indicating that Paulose's position as a probationary math teacher was jeopardized by his receipt of three unsatisfactory observation reports. Randina reassigned Paulose to a non-teaching position in the main office of the school.

D. Alleged Racial Discrimination at CIS 339

After he rescinded his resignation letter, Paulose spoke with Williamson, who told him that Randina, Altreche and Levine had sought to convince him to sign the resignation letter in an effort to remove him because he was not white. Williamson also indicated that Randina sought to replace Paulose with an inexperienced, unlicensed teacher whom he preferred and wanted to assist in securing a teaching license and other requirements.

Paulose noticed that after his rescission of the letter of resignation, "most teachers avoided him when they saw [him]."

---

[10] While the plaintiff stated in his affidavit that he rescinded his resignation on February 2, his rescission letter is dated January 30.

[11] Defendant's initial Rule 56.1 Statement states that Randina reassigned Paulose on February 1, while Randina's letter of reassignment is dated February 2.

During the first two weeks following his reassignment to the main office, Paulose was confronted by two unnamed white eighth grade teachers. In two separate incidents, these teachers stated in front of Paulose, "Indians should not be here," "that guy didn't resign," "he cannot teach, he should not be here," and "you should not be here teaching, what the hell is wrong with you?"[12] Paulose did not respond, but felt intimated. As a result, he kept a distance from other staff members and worked "in a room or closet all by [him]self" when completing his work.

A teacher by the name of "Mr. Schwartz" ("Schwartz") replaced Paulose in his former classroom.[13] After Schwartz began teaching the class, the number of students was reduced from 30 to 19. In his first four months of teaching, Schwartz was observed twice and received one unsatisfactory rating. Schwartz was offered a sample math lesson plan by Patricia Fusco, the school's math coach, in case he did not already have one.[14]

In February, Paulose spoke with a CIS 339 teacher who told him that Randina directed the students of an African-American teacher to write letters reporting that she cursed in class, and

---

[12] Paulose has not identified the teachers who made these statements.

[13] Neither party has submitted evidence as to Schwartz' race, ethnicity, national origin, or current employment status.

[14] The parties have not submitted any other information as to Schwartz' qualifications for the sixth grade math teacher position.

then supposedly used these letters to remove the teacher from the school.  Paulose later contacted this teacher directly to discuss the circumstances of the termination of her employment.

E. Plaintiff's Complaints to DOE Officials

During this time, Paulose wrote to DOE officials regarding his grievances.  On February 12, Paulose complained to the Region One Superintendent in charge of CIS 339, Irma Zardoya ("Zardoya"), about the unsatisfactory observations of his teaching and the events surrounding his reassignment from teaching to office work.  In letters he handed to Randina's secretary and Levine on February 22, Paulose contested the unsatisfactory observation reports dated January 28 and 30, emphasizing the positive aspects of his performance during both lessons, objecting that he was not given a math mentor or provided pre-observation conferences, and arguing that his last two observations were administered back to back.

During the week of February 22, union representative Levine sent Paulose a New York Times article entitled, "The Newest Road to the American Dream: The Heir to the Chinese laundry, the Greek diner and the Korean deli?  The South Asian cellphone store."  The article discussed the entrance of Indian immigrants into the New York City cellphone industry.

Almost four weeks after his reassignment to office work, Paulose notified DOE for the first time of his concerns regarding student sexual misconduct at the school and the administration's failure to report or address it.  On February 27, Paulose emailed Zardoya and Chancellor Joel Klein ("Chancellor") to seek an "Internal Independent Investigation at CIS 339" of "instances of sexual molestation of students by students being swept under the table."[15]  In these emails, Paulose also complained that he was not given "unmentionable administrative support" extended to other teachers.  Making his first reference to race discrimination, he noted that a source informed him that the true motivations behind his reassignment were that "the principal's relative needed a job" and that Randina "does the same thing to people of minority origin every

---

[15] Plaintiff states in his 56.1 Statement that he first alerted Zardoya and the Chancellor to "improper conduct" at CIS 339 on February 2 through "letters which are undated and an email to the Region One Superintendent."  To support this fact, Paulose submits an undated letter that he wrote to Zardoya, which refers to the termination of his employment from CIS 339 on April 2 in the past tense.  Not only could this letter not have been written on February 2, it does not report any purported cover up of sexual misconduct at CIS 339.  It is focused solely on Paulose's complaints about the circumstances surrounding his negative performance ratings, the termination of his employment, and an allegation that the transfer of "disruptive" students out of his former class is indicative of race discrimination.  The letter, moreover, is identical (save the absence of any date) to an April 14 letter from the plaintiff to Zardoya, which was submitted by both parties.

year."  There is no evidence that these officials responded to these emails.[16]


F. Plaintiff Leaves CIS 339

On March 3, Randina completed an annual performance review of Paulose in which he recommended the discontinuance of the plaintiff's probationary employment.[17]  That same day, Yvonne Torres, the Superintendent of District Nine, issued a letter indicating that she would review Paulose's record for consideration of whether his probationary employment should be terminated on April 5.

Shortly thereafter, Levine sent plaintiff a March 14 New York Times article entitled, "Corporate America Sending More Legal Work to Bombay."  Paulose felt that Levine's action was inappropriate and a way of "telling [him] not to be a teacher in New York City or not to even be in this country."

Sometime in March 2004, at a meeting between Paulose, Levine, Randina, and Kathy Tuttle, the Superintendent of District Nine, Tuttle permitted Randina to read the plaintiff's

---

[16] The defendant contests this fact, but has not provided any evidence that these or any other DOE officials responded to Paulose's emails.

[17] This review reported the three unsatisfactory observations of plaintiff's teaching in October 2003 and January 2004, but did not report the satisfactory review by Williamson in December 2003.

emails and letters to Zardoya.[18]  On March 25, Torres notified

Paulose that his probationary employment would be discontinued

as of the close of business on April 5, and granted him fifteen

days to appeal the decision.  Her letter advised the plaintiff

that he would be placed on the "Inquiry List."[19]  On March 25,

Paulose wrote to Torres, emphasizing his qualifications for

teaching and criticizing the circumstances surrounding his

reassignment and the negative evaluations of his teaching.

    Paulose appealed his termination to the Office of Appeals

and Review on April 14.  There is no indication that the office

responded to his letter.  That same day, Paulose sent identical

letters to Superintendent Zarodya and the Chancellor,

emphasizing that Altreche, not his immediate supervisor,

Williamson, conducted the final observation which led to his

---

[18] The plaintiff has submitted contradictory evidence as to the
precise date of this meeting.  At one point during his
deposition, he testified that he was uncertain of the date of
the meeting, but believed it took place in March 2004.  Later,
he testified that it was held on March 25.  Paulose has also
submitted a June 16, 2004 letter of complaint to the Office of
Special Commissioner of Investigations in which he wrote that
the meeting took place on March 9.

[19] The DOE Inquiry List is maintained by the Office of Personnel
Investigation ("OPI") in the DOE Division of Human Resources.
It is "a list of names of individuals who should be closely
investigated and carefully considered before hiring."  Various
offices throughout DOE submit "names and reasons for placement
on the list" to a Monitoring Unit.  The OPI administrator
regularly reviews the Inquiry List to determine whether a
particular DOE teaching applicant can be hired and whether the
application "should receive more intensive scrutiny."

firing, that he did not receive support in implementing the "workshop model" in his teaching, and that his requests for an independent investigation were ignored.  Paulose also suggested that Randina showed preference on the basis of race by favoring Paulose's successor, namely through the transfer of "disruptive and troublesome students" out of his former class.  On June 16, Paulose also wrote to the Office of Special Commissioner of Investigations, requesting an independent investigation of his case.  In this letter, Paulose again emphasized that at least two of the observations of his performance were not prefaced by pre-observation conferences and that he felt pressured to resign.  Paulose communicated that his removal from CIS 339 "appear[ed] to be a set up," that he believed he was the victim of discrimination and unlawful termination, and that his chapter leader and union representatives were not "looking out for [his] best interest."  Paulose contends that he received no response.[20]

During the third week of August,[21] Levine sent Paulose a letter with a copy of an August 18 New York Times article entitled, "Financial Firms Hasten Their Move to Outsourcing." Levine wrote the plaintiff, "I hope you are having a nice

---

[20] The defendant contests this fact but has not submitted evidence to demonstrate that the Office of Appeals and Review responded to Paulose.

[21] The parties disagree as to the precise date when Levine sent this article and note to the plaintiff.

summer.  I thought you might be interested in this article from today's New York Times.  Mr. Randina retired on August 11, 2004."

G. Application for Position at Beach Channel High School

In September 2004, the plaintiff sought a position as a math teacher in Beach Channel High School ("Beach Channel"), a school in DOE Region Five.  That month, he was interviewed by the assistant principal of the school and was formally nominated for a position by the principal on September 30.  At the time, Paulose held an "initial" teaching certificate issued by the University of the State of New York Education Department, which permitted him to teach math to students in grades seven through twelve effective as of September 1, 2004.[22]

In that very same month, September 2004, Beach Channel was designated a "school in need of improvement" ("SINI") under the federal No Child Left Behind Act ("NCLB Act"), which at the time required the school to employ only teachers who were designated "highly qualified."  20 U.S.C. § 6319(a)(1) (2003).  A "highly qualified" teacher under the NCLB Act in New York is a teacher

_____

[22] Prior to receiving his "initial" teaching certificate, the plaintiff held an "intern" certificate issued by the University of the State of New York Education Department, effective on February 1, 2004.

with a permanent certification.[23]  No teacher lacking a permanent
certification was hired at Beach Channel in September 2004.

Paulose was ultimately not extended an offer to work as a
probationary teacher at the school.[24]  Based on a review
conducted on September 1, 2006, Carmela Cuddy, the OPI
Administrator, reviewed Paulose's records and reported that
Paulose was never placed on the Inquiry List and is therefore
"not prohibited from obtaining employment with the DOE if he
meets other employment requirements."  Cuddy also attested that

---

[23] The plaintiff contends that to be considered "highly
qualified," a teacher is obligated only to have "an acceptable
credential."  As support, he provides a printout from the
website of the University of the State of New York, State
Education Department setting forth "Definitions of 'Highly
Qualified' Teachers."  The printout, however, does not address
what is required of a New York teacher under the NCLB Act to be
"highly qualified."  It does not indicate that only "an
acceptable credential" is necessary.  The printout merely states
that one way for a teacher to be "deemed 'certified' for a
teaching assignment in a core academic subject" is to secure an
"acceptable credential" for that teaching assignment.

   Acceptable credentials for a teaching assignment are
   - licenses issued by the City School District of the
     City of New York for employment in that district; or
   . . .
   - currently valid teaching credentials issued by SED
     except for the following two credentials:
         - a modified temporary license; and
         - an internship certificate held by an
           individual who has not passed all
           applicable examinations.

[24] Paulose speculates that he was not extended an offer by Beach
Channel because he was "blacklisted" by DOE, which prevented the
school from locating his record.

there is "no indication in the records that Mr. Paulose's name has ever appeared on the Inquiry List."

H. Current Work and Status

After the rejection of his application for the Beach Channel teaching position, the plaintiff worked as a real estate investment consultant in Great Neck, New York.  Paulose resigned from this position because his daily commute was too long. Since June 2005, Paulose has worked as a math teacher in two schools that are not run by the DOE, Rockland Children's Psychiatric Center[25] and Museum Middle School.[26]  At both schools, he has received satisfactory performance evaluations.  In his current position at Museum Middle School, Paulose received a satisfactory annual evaluation.

I. Litigation

On December 21, 2004, Paulose filed a verified complaint with the New York State Division of Human Rights ("NYSDHR"), charging the DOE with an unlawful discriminatory practice and for retaliating against him for reporting acts of discrimination

[25] Rockland Children's Psychiatric Center is a branch of the New York State Office of Mental Health.

[26] Museum Middle School is a public middle school in the Yonkers' school system.

and sexual misconduct in violation of Title VII and the State HRL, N.Y. Exec. § 296.  Paulose filed this action on November 3, 2005.  Following the completion of discovery, the defendants filed this motion for summary judgment.[27]

DISCUSSION

Summary judgment may not be granted unless all of the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination, the court must view all facts in the light most favorable to the non-moving party.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Sista v. CDC Ixis N. Am., Inc., 445 F.3d 161, 169 (2d Cir. 2006).  When the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing

---

[27] After the completion of briefing on the instant motion, the plaintiff requested, by letter, the opportunity to file a sur-reply on the grounds that the defendant raised in reply a new issue regarding whether plaintiff challenged Randina's actions through the grievance procedure set forth in the United Federation of Teacher's collective bargaining agreement.  The defendant opposed the request, noting that the issue was not first raised in reply, but in response to plaintiff's argument in opposition that Randina conducted observations of the plaintiff without due process.  This issue is irrelevant to the analysis that follows.  Plaintiff's request for a sur-reply is denied.

party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on the "mere allegations or denials" of the movant's pleadings.  Fed. R. Civ. P. 56(e); accord Sista, 445 F.3d at 169.  Only disputes over material facts, facts that might affect the outcome of the suit under the governing law, will properly preclude the entry of summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Paulose brings claims under Title VII, 42 U.S.C. §§ 2000e-2 to 2000e-3; the State HRL, N.Y. Exec. Law § 296, and the City HRL, N.Y.C. Code § 8-107.  Since the standards under these statutes are identical in all respects that are material to this motion, only the Title VII claims will be addressed below.[28]

I. Discrimination on the Basis of Race and National Origin

In his complaint, Paulose identifies four adverse employment actions taken against him as a result of racial discrimination.  He received negative observation reports in violation of established policies, was sent "racist articles," was demoted from teaching to performing "janitorial tasks such as cleaning out and dusting closets and arranging files in the

---

[28] The standards for liability under the State and City HRL are the same as those under equivalent federal antidiscrimination statutes.  Ferraro v. Kellwood Co., 440 F.3d 96, 99 (2d Cir. 2006).

front office," and was forced to resign from teaching, as a result of discrimination on the basis of race.  The defendant's submissions on the instant motion interpret the plaintiff also to allege that he suffered two additional adverse employment actions: the DOE's termination of his probationary service and its rejection of the plaintiff for the teaching position at Beach Channel.  In his opposition, the plaintiff has in turn multiplied his allegations to include six more alleged adverse employment actions suffered on the basis of race and national origin.[29]

An adverse employment action is a "materially adverse change in the terms and conditions of employment.  To be materially adverse, a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities."  Sanders v. New York City Human Res. Admin., 361 F.3d 749, 755 (2d Cir. 2004) (citation omitted).  Such

---

[29] The plaintiff's opposition alleges that the following six actions are also acts of either discrimination or retaliation: 1) the failure of the DOE to provide him a mentor as required by the New York State Education Department, 2) teaching evaluations without pre-observation hearings, 3) four observations of his teaching in the first four months of his employment, 4) racist comments toward him by "most teachers," 5) the placement of his name on the Inquiry List, and 6) his blacklisting from future DOE employment.  The first three relate to his receipt of negative evaluations.  The last two relate to his failure to obtain the position at Beach Channel.  The racist remarks by teachers are discussed in connection with the hostile work environment claim.

changes include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation."  Id. (citation omitted).

Paulose's forced resignation does not constitute an adverse employment action because he was able to retract it shortly after it was tendered.  The attempt by Randina, Altreche and Levine to secure Paulose's resignation is therefore better considered as evidence of discriminatory intent and as part of the plaintiff's hostile work environment claim, as are Levine's acts in sending the plaintiff articles on India and South Asians.

Plaintiff's disparate treatment claim will therefore be construed to allege four adverse employment actions: the negative observation reports, demotion from teaching, the termination of plaintiff's probation, and Beach Channel's failure to hire him.  This section will first treat the adverse employment actions that took place while the plaintiff was employed at CIS 339 and will separately address the plaintiff's contention that he was rejected from the Beach Channel position on account of discrimination on the basis of race or national origin.

Claims of disparate treatment under Title VII are analyzed with the burden-shifting approach set forth in McDonnell-Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973).  The plaintiff bears the initial burden of establishing a prima facie case of discrimination.  Williams v. R.H. Donnelley Corp., 368 F.3d 123, 126 (2d Cir. 2004).  If the plaintiff succeeds, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action.  Demoret v. Zegarelli, 451 F.3d 140, 151 (2d Cir. 2006).  The defendant's burden is "one of production, not persuasion."  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000).  If the employer meets its burden, "the burden shifts back to the plaintiff to prove discrimination, for example, by showing that the employer's proffered reason is pretextual."  Demoret, 451 F.3d at 151.

A plaintiff's burden in presenting prima facie evidence of discriminatory treatment is de minimis, Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 467 (2d Cir. 2001), but the plaintiff must nonetheless establish that

> (1) he is a member of a protected class; (2) he is competent to perform the job or is performing his duties satisfactorily; (3) he suffered an adverse employment decision or action; and (4) the decision or action occurred under circumstances giving rise to an inference of discrimination based on his membership in the protected class.

Dawson v. Bumble & Bumble, 398 F.3d 211, 216 (2d Cir. 2005)

(citation omitted).  With respect to the fourth element of the

prima facie case, a plaintiff may meet her burden of

establishing an inference of discriminatory intent through a

number of means, including

> the employer's criticism of the plaintiff's performance in
> ethnically degrading terms; or its invidious comments about
> others in the employee's protected group; or the more
> favorable treatment of employees not in the protected
> group; or the sequence of events leading to the plaintiff's
> discharge.

Abdu-Brisson, 239 F.3d at 468 (citation omitted).  If the

plaintiff seeks to carry this burden by "showing that the

employer treated plaintiff less favorably than a similarly

situated employee outside [her] protected group, . . . [she]

must show she was similarly situated in all material respects to

the individuals with whom she seeks to compare herself."

Mandell v. County of Suffolk, 316 F.3d 368, 379 (2d Cir. 2003)

(citation omitted).  "A plaintiff is not obligated to show

disparate treatment of an identically situated employee" when

presenting prima facie evidence of discrimination, but the

object of comparison "must have a situation sufficiently similar

to plaintiff's to support at least a minimal inference that the

difference of treatment may be attributable to discrimination."

McGuinness v. Lincoln Hall, 263 F.3d 49, 54 (2d Cir. 2001).

A. Disparate Treatment at CIS 339: Negative Evaluations, Demotion, and End of Probation

Paulose has not established a _prima facie_ case that the negative evaluations of his teaching, his demotion to work in the CIS 339 main office, or the termination of his probationary employment at CIS 339 constituted acts of discrimination.  There is no dispute that he is a member of a protected class or that he suffered these three adverse employment actions.  Nor is there any real dispute that Paulose met the _de minimis_ showing that he was qualified for his position as a sixth grade math teacher at CIS 339.  Paulose had college-level training in mathematics, a bachelor of science degree, two masters degrees, one of which was in education, and was hired by Randina to work at CIS 339.  Despite the defendant's attempts to demonstrate that Paulose was not satisfactorily performing his job when he received unsatisfactory reviews, was demoted, and was subsequently discontinued as a probationary employee, the plaintiff has met the _de minimis_ burden required at this stage for the first three prongs of the _prima facie_ test.

Paulose fails, however, to prove that the three alleged adverse employment actions occurred under circumstances giving rise to an inference of discrimination on the basis of his race or national origin.  Paulose has not pointed to any stray remarks by Randina, Altreche, or Torres -- the administrators

who were involved in evaluating his performance, reassigning him
to non-teaching work, and deciding to discontinue his
probationary employment at CIS 339 -- that indicate that the
plaintiff's race or national origin played a role in their
decisions.  Nor has Paulose identified any statements by these
actors "critici[zing] [his] performance in ethnically degrading
terms" or making "invidious comments" about "Asians of East
Indian origin" as a whole.[30]

Paulose's attempt to establish an inference of
discrimination by identifying the more favorable treatment of
Schwartz similarly fails.  The plaintiff has submitted evidence
in the form of his own testimony that Schwartz was given only
two observation reports during his first four months in contrast
to the four that Paulose received, and that one of the two
evaluations returned a negative rating.[31]  The plaintiff also

---

[30] While Paulose has pointed out that two unnamed white eighth
grade teachers at CIS 339 made racist remarks towards him, these
remarks cannot be imputed to the decisionmakers in Paulose's
case, even if they are considered to be ethnically degrading or
to constitute invidious comments about his protected group,
which is far from clear.  He has not presented any evidence that
the decisionmakers were aware of or condoned the remarks.  Nor
do Paulose's general contentions that "most teachers" made
racist comments toward him establish an inference of
discrimination.  "It is not sufficient merely to assert a
conclusion without supplying supporting arguments or facts."
BellSouth Telecomms., Inc., 77 F.3d 603, 615 (2d Cir. 1996)
(citation omitted).

[31] Paulose has not explained how he learned these facts or
offered admissible evidence of them.  Since the DOE does not

argues that after Schwartz assumed the position, the size of the class was dramatically reduced and disruptive students were removed.  Paulose has failed, however, to submit any evidence on Schwartz's professional qualifications, racial background, national origin, or his current employment status with the DOE. Without such minimal evidence, the plaintiff has not met the de minimis burden of demonstrating that a similarly situated individual who is not a member of his protected group was treated more favorably by, for example, remaining employed at CIS 339 despite receiving a negative performance rating.

Even if plaintiff had met the requirements of the prima facie case with respect to his negative evaluations, demotion, and firing, the defendant would still be entitled to summary judgment on these claims.[32]  The defendant has shown a non-

---

dispute the accuracy of these assertions, however, they have been accepted as true for this Opinion.

[32] The defendant raises the "same actor inference" to argue that the plaintiff has not established an inference of discrimination because the same person -- Randina -- hired the plaintiff and subsequently gave him negative performance ratings, demoted him, and recommended the discontinuance of his probationary employment.  When the same person hires and later fires an individual who is a member of a protected class, "it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire. . . . [W]here the termination occurs within a relatively short time after the hiring there is a strong inference that discrimination was not a motivating factor in the employment decision."  Carlton v. Mystic Transp., Inc., 202 F.3d 129, 137 (2d Cir. 2000) (citation omitted) (collecting cases).  It is unnecessary to address the application of the same actor inference because the plaintiff

discriminatory reason for its actions, to wit, the plaintiff's deficient performance.  For the reasons already discussed, the plaintiff has failed to offer evidence to raise a question of fact as to whether the defendant took these actions due to an invidious motive.

Paulose's evidence that Williamson said to him that Randina had targeted African-American teachers is unsupported by either testimony from Williamson or any evidence of the events giving rise to that charge.  Similarly, Williamson's later comments to Paulose about Randina's motives for removing Paulose from his teaching position are unsupported by any evidence from Williamson that would explain the basis for concluding that Randina had a discriminatory purpose.  In these and other instances, Paulose has tried to fill an evidentiary gap through a proffer of inadmissible hearsay.

B. Disparate Treatment After CIS 339: Blacklisting and Rejection from Beach Channel High School

There is no dispute that Paulose is a member of a protected class or that he was rejected from the Beach Channel position. At issue in this claim is whether plaintiff has made the second

---

has failed to offer evidence supporting an inference of discrimination through the identification of a similarly situated person who was treated differently or any other means.

showing necessary to establish a <u>prima facie</u> case of discrimination: that Paulose was qualified for the position at Beach Channel.  Once Beach Channel became an SINI, it was only permitted to hire and only hired teachers who had permanent certification.  It is undisputed that Paulose did not have that certification at the time he applied to Beach Channel.  This claim must also be dismissed.

Paulose speculates that his placement on the Inquiry List influenced Beach Channel's decision not to offer him a job.  He has failed to offer evidence that his name ever appeared on the list.  Even if he could produce such evidence, however, that would not alter the conclusion that this prong of his discrimination claim must be dismissed.  Without evidence to raise a question of fact that he qualified for a job at Beach Channel, this dispute over the Inquiry List is immaterial.

II. Title VII Retaliation

In his complaint, Paulose alleges that he suffered the following adverse employment actions as a result of retaliation for opposing sexual misconduct and discrimination on the basis of race and national origin at CIS 339: 1) negative performance evaluations, 2) harassment, 3) demotion from teaching to clerical and janitorial work in the main office, 4) racial insults, 5) DOE inaction in response to his complaints of

discrimination and retaliation, and 6) blacklisting from future DOE employment.  The defendant's brief on the motion assumes arguendo that the retaliatory conduct was solely the demotion, the discontinuance of Paulose's probationary employment, and rejection for the Beach Channel position.  As described above, the plaintiff's opposition brief expanded his retaliation claim to include more adverse employment actions.

Unlike a disparate treatment claim, an adverse employment action in the context of a retaliation claim is not limited to actions that effect the terms and conditions of employment.  To succeed on a retaliation claim, the plaintiff must show that the action "might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  Kessler v. Westchester County Dept. of Soc. Servs., 461 F.3d 199, 207 (2d Cir. 2006) (citation omitted).  This discussion will assume that the retaliation claim includes the following adverse employment actions: 1) the negative performance evaluations, 2) the forced resignation, 3) the demotion, 4) the placement on the Inquiry List, 5) the discontinuance of probationary employment, and g) the rejection from the Beach Channel position.  The first part of this section will address the allegations that plaintiff experienced retaliation at CIS 339.  The second part will highlight alleged retaliation after plaintiff left the school.

Title VII forbids retaliation against an employee for opposing any practice made unlawful by the statute.  42 U.S.C. § 2000e-3(a).  Title VII provides that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [such employee] has opposed any practice made an unlawful employment practice by this subchapter. . . . "  42 U.S.C. § 2000e-3(a).

Retaliation claims, like other Title VII claims, are evaluated under the three-step burden shifting analysis.  Jute, 420 F.3d at 173.  First, the plaintiff must make out a prima facie case; second, the defendant must articulate a non-retaliatory reason for the action; third, if the defendant meets its burden, the "plaintiff must demonstrate that there is sufficient potential proof for a reasonable jury to find the proffered legitimate reason merely a pretext for impermissible retaliation."  Quinn v. Green Tree Credit Corp., 159 F.3d 759, 764 n.5 (2d Cir. 1998) (citation omitted).  In the third step, "the presumption of retaliation dissipates and the employee must show that retaliation was a substantial reason for the adverse employment action.  Jute, 420 F.3d at 173.

In order to establish a prima facie case of retaliation, an employee must show "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between

the protected activity and the adverse employment action." Id.
(citation omitted).  With respect to the second prong of the
prima facie case, "[n]either [the Second Circuit] nor any other
circuit has ever held that, to satisfy the knowledge
requirement, anything more is necessary than general corporate
knowledge that the plaintiff has engaged in a protected
activity." Kessler, 461 F.3d at 210 (citation omitted).  The
plaintiff is similarly required to make only a minimal showing
to meet the fourth prong of the prima facie case.  "The
plaintiff's burden at the beginning of the case is a light one,
usually demanding only that the protected activity preceded the
adverse action in order to satisfy the causation requirement."
Raniola v. Bratton, 243 F.3d 610, 624 (2d Cir. 2001).


A. Retaliation at CIS 339

     Paulose is unable to establish the first prong of the prima
facie case with respect to his claim that he experienced
retaliation for reporting the cover up of student-on-student
sexual misconduct at CIS 339, which he first did on February 27.
Such speech does not constitute opposition to a "practice made
an unlawful employment practice" by Title VII, 42 U.S.C. §

2000e-3(a).  The defendant is therefore granted summary judgment on this aspect of Paulose' retaliation claim.[33]

Even when reading Paulose's claim to be that he faced retaliation for reporting incidents of racial or national origin-based discrimination at CIS 339, practices deemed unlawful by Title VII itself, the plaintiff has failed to establish the second and fourth prongs of the <u>prima facie</u> case for three of the adverse employment actions taken against him at CIS 339 -- the negative evaluations of his performance, his forced resignation, and his demotion.  Paulose made his first report of racial discrimination on February 27,[34] months after his first negative evaluation, and almost one month after his second and third negative evaluations, forced resignation, and demotion to non-teaching work in the main office.  He has failed to demonstrate causation because these adverse employment

---

[33] Paulose could only contest retaliation for challenging student-on-student sexual misconduct at CIS 339 by bringing a First Amendment retaliation claim, which would have required pleading a violation of rights protected by the First Amendment, 42 U.S.C § 1983.  <u>Skehan v. Village of Mamaroneck</u>, 465 F.3d 96, 106 (2d Cir. 2006).  The plaintiff conceded this issue in his opposition on the instant motion.

[34] Paulose's October 2003 complaints to Randina and his union representative about the lack of notice prior to his October 2003 performance evaluation were not complaints of any action made illegal by Title VII.  While the plaintiff contends in his brief on the instant motion that he first complained in October 2003 about Randina's discrimination against him, the plaintiff has not submitted any evidence that would raise a question of fact on this issue.

actions preceded his earliest report of discrimination.  The
plaintiff has also failed to establish the third prong of the
prima facie case for the fourth adverse employment action
allegedly taken against him at CIS 339 -- his placement on the
Inquiry List -- because he has not provided sufficient evidence
that he was indeed placed on this list.  While Torres' March 3
letter indicated that Paulose's name would be placed on the
list, the OPI Administrator has confirmed that this action was
not carried out.  Summary judgment is granted to the defendant
on Paulose's claim that he was given negative performance
evaluations, forced to resign, demoted, and placed on the
Inquiry List in retaliation for reporting discrimination on the
basis of race and national origin.

     With respect to Paulose's termination as a probationary
employee, the fourth adverse action at CIS 339, the plaintiff
has established a prima facie case of retaliation.  In this
case, his February 27 letter to Zardoya and Chancellor Klein
reporting that "people of minority origin" faced discrimination
at CIS 339 preceded the adverse action -- Torres's March 25
decision to discontinue Paulose's probationary employment at CIS
339 -- thereby establishing the first, third and fourth prongs
of the prima facie case.  While the parties dispute whether
Randina -- and presumably Torres -- had personal knowledge of
the plaintiff's complaints of discrimination, this dispute is

immaterial to an evaluation of plaintiff's prima facie evidence.[35]  To satisfy the second prong, Paulose must only demonstrate "general corporate knowledge that [he] has engaged in a protected activity."  Kessler, 461 F.3d at 210.  His February 27 letter to DOE officials Zardoya and Chancellor Klein constitutes evidence that the DOE had general corporate knowledge as of that date that Paulose had reported racial and national-origin based discrimination at CIS 339.  Moreover, the DOE -- not Randina or Torres -- is the defendant on the retaliation claim.  Plaintiff's showing of general corporate knowledge therefore satisfies his burden to establish a prima facie case of retaliation with respect to the sole issue of the termination of his probationary employment at CIS 339.  See id. (finding that plaintiff is not required to demonstrate knowledge of the corporate agent who made the decision to terminate him to establish prima facie case of retaliation); see also Gordon v. New York City Bd. of Educ., 232 F.3d 111, 117 (2d Cir. 2000) (finding erroneous a jury instruction requiring plaintiff to demonstrate knowledge on the part of corporate agents to establish a prima facie case of retaliation).

---

[35]  The defendant concedes that Randina first became aware of Paulose's report as early as March 25, as the plaintiff testified in his deposition.  The plaintiff contends in his brief opposing the instant motion that Randina was aware of his reports of discrimination as early as October 2003, but has failed to submit evidence to support this allegation.

Since Paulose has established a prima facie case of
retaliation as to this one adverse employment action, the burden
shifts to the defendant to articulate a legitimate non-
retaliatory reason for its decision.  The defendant has pointed
to the "plaintiff's poor work performance, poor classroom
management, inferior instruction, and lack of qualifications."
Its argument boils down to the claim that plaintiff's work did
not meet expectations at CIS 339, as supported by Randina and
Altreche's negative evaluations of the plaintiff's teaching.

The plaintiff has proferred evidence attempting to show
that the decision to discontinue his employment at CIS 339 was a
pretext for discrimination, rather than the result of poor
performance.  The strongest evidence in his favor is the
temporal connection between his first report of racial
discrimination to Zardoya and Chancellor Klein on February 27
and Torres' March 3 letter indicating her imminent review of
Paulose's file, as well as her March 25 decision to terminate
his probation.

At this stage, the plaintiff may survive summary judgment
only if there is a "sufficient basis for a trier of fact to
doubt the persuasiveness of [the defendant's] proffered evidence
and ultimately to find that the [legitimate, non-retaliatory]
reasons offered by [the defendant] . . . were pretextual."
Jute, 420 F.3d at 180.  While a court must "construe the record

in the light most favorable to [the non-moving party]," id. at
180, the plaintiff's evidence does not meet the threshold
required to withstand summary judgment.

Torres' March 3 decision to review Paulose's record and her
March 25 decision to terminate his probation were the
predictable and direct result of the plaintiff's three negative
performance evaluations and Randina's decision to remove him
from teaching duties and assign him to do office work, all of
which happened weeks before his complaint of discrimination.[36]
Given the weight of this historical record, a jury would be
unable to conclude that the decision to terminate Paulose's
probationary employment was substantially motivated by the
February 27 emails to Zardoya and Chancellor Klein with their
vague accusation that Randina "does the same thing to people of
minority origin every year."  The plaintiff has failed to
proffer sufficient evidence to raise a question of fact that the

_____

[36] Torres' March 3 letter stated that her decision whether to
terminate Paulose's probationary employment would be based on
review of his annual performance evaluation and its supporting
documentation.  Randina submitted this annual evaluation on the
same date, and included as supporting documentation the three
negative evaluations of the plaintiff issued between October
2003 and January 2004.  He did not, however, include
Williamson's December 2003 positive evaluation of the
plaintiff's performance.  While the plaintiff argues that this
omission constitutes evidence of Randina's discriminatory
intent, he has not argued that this omission supports the
conclusion that Torres' March 25 decision to discontinue
Paulose's employment was a retaliatory act.

DOE's legitimate, non-retaliatory reason for terminating his employment -- Paulose's poor performance as a junior high math teacher -- was a pretext for retaliation.  Summary judgment is therefore also granted on Paulose's claim that he was discontinued from his employment at CIS 339 in retaliation for reporting discrimination prohibited by Title VII.

B. Retaliation After CIS 339 – Beach Channel

For the reasons already discussed, the defendant has demonstrated that there is no question of material fact as to whether Beach Channel's decision not to hire Paulose related to the emails he sent Zardoya and the Chancellor on February 27, 2004.  As an SINI, Beach Channel was not allowed to hire Paulose because he did not have a permanent teaching certification.

III. Hostile Work Environment

While Paulose does not separately allege that he was subjected to a hostile work environment on the basis of race or national origin in his complaint, this claim is related to his allegations that he was forced to resign, sent racist articles, and confronted by racist comments by other teachers in CIS 339. Unlike claims of discrimination based on disparate treatment or retaliation, a hostile work environment claim is "based on the cumulative effect of individual acts."  Nat'l R.R. Passenger

Corp. v. Morgan, 536 U.S. 101, 115 (2002).  Title VII is
violated "when the workplace is permeated with discriminatory
intimidation, ridicule, and insult, that is sufficiently severe
or pervasive to alter the conditions of the victim's employment
and create an abusive working environment."  Id. at 116
(citation omitted).

Hostile work environment claims must meet both an objective
and a subjective standard.  Not only must the victim herself
"subjectively perceive [the] environment to be abusive," but the
misconduct of which a plaintiff complains also must be "severe
or pervasive enough to create an objectively hostile or abusive
work environment."  Petrosino v. Bell Atlantic, 385 F.3d 210,
221 (2d Cir. 2004) (citation omitted).  As a general matter, the
conduct of which a plaintiff complains "must be sufficiently
continuous and concerted in order to be deemed pervasive."
Feingold v. New York, 366 F.3d 138, 150 (2d Cir. 2004).
"Isolated acts, unless very serious, do not meet the threshold
of severity or pervasiveness."  Alfano v. Costello, 294 F.3d
365, 374 (2d Cir. 2002).

The defendant has demonstrated that Paulose has failed to
raise any triable question of fact as to whether he suffered
from "severe or pervasive" misconduct at CIS 339.  The January
30 meeting in which officials obtained plaintiff's forced
resignation was no doubt a difficult experience.  Paulose,

however, has not identified any objectively unreasonable behavior toward him by any participant.  Nor has he attributed racist or discriminatory comments to anyone with whom he spoke on that day.  The meeting was a one time occurrence and the plaintiff was able to withdraw his resignation immediately.

Levine's acts of mailing two articles to the plaintiff while he was still employed at CIS 339 in a non-teaching position and one four months after his discontinuance, may be interpreted as insulting or insensitive.  They are not, however, sufficiently "continuous or concerted" to rise to the level of severe and pervasive abuse.  Although it may have been insensitive of Levine to mail these articles to the plaintiff, "Title VII is not a general civility code." Bickerstaff v. Vassar Coll., 196 F.3d 435, 452 (2d Cir. 1999) (citation omitted).  There are other defects to this claim as well.  It is not clear that Levine's actions may be imputed to the DOE. Levine was Paulose's union chapter leader.  While Paulose argues that Levine's actions also reflect Randina's sentiments, he points to no evidence to support his argument.  He has not shown, for instance, that Randina even knew that Levine had sent the articles.

Paulose's effort to point to discriminatory remarks by other teachers at CIS 339 is similarly flawed.  The claim that other teachers in CIS 339 made racist comments about persons of

East Indian descent are devoid of any specifics other than Paulose's testimony that on two separate incidents, two white eighth grade teachers stated in his presence that "Indians should not be here," "you should not be here teaching, what the hell is wrong with you?," "that guy didn't resign," and "he cannot teach, he should not be here."  He fails, however, to identify the names of the teachers who threatened or harassed him, the dates of these incidents, or any witnesses to the actions.  Statements that are devoid of specifics are insufficient to defeat a properly supported motion for summary judgment.  Id.  "It is not sufficient merely to assert a conclusion without supplying supporting arguments or facts." BellSouth Telecomms., 77 F.3d at 615 (citation omitted).  The defendant is granted summary judgment on Paulose's hostile work environment claim.


CONCLUSION

     Defendant's motion for summary judgment is granted with

respect to plaintiff's disparate treatment, retaliation, and

hostile work environment claims.   The Clerk of Court shall close

this case.

     SO ORDERED:

Dated:     New York, New York
           May 10, 2007

                                   _____
                                        DENISE COTE
                                   United States District Judge

41